FILED

2019 Apr-01  AM 10:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

JET/DH APRIL 2019
GJ #36

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case No. _____** |
| ) | **UNDER SEAL** |
| **ELZABETH KORCZ, M.D.,** ) | |
| **MATTHEW KORCZ, and** ) | |
| **AUSTIN HASKEW** ) | |
| ) | |
| **Defendants.** ) | |

## INDICTMENT

The Grand Jury charges:

At times material to this Indictment, unless otherwise specified:

### THE DEFENDANTS

1.     Defendant **ELIZABETH KORCZ** was licensed by the State of Alabama to practice medicine and maintained a Controlled Substance Registration number, a DEA Registration number, and a Medicare provider number.  She was the owner and sole physician at a family medicine clinic, Alt MD PC, doing business as Hoover Alt MD, located in Hoover, in the Northern District of Alabama.

2.     Defendant **MATTHEW KORCZ** was the practice manager at Hoover Alt MD and **ELIZABETH KORCZ's** husband.  **MATTHEW KORCZ** held no medical licensure or certification.  **MATTHEW KORCZ** was primarily responsible

for billing insurance companies for purported office visits and procedures at Hoover Alt MD.

3.     Defendant **AUSTIN HASKEW** was a pharmacy technician at Hoover Alt MD.

4.     Person 1 was Hoover Alt MD's office manager.  Person 1 had no medical education or licensure.

<h3 align="center">HOOVER ALT MD AND THE KORCZ DISPENSARY</h3>

5.     Hoover Alt MD was a medical clinic, operating at 3421 S. Shades Crest Road, Suite 111.  Hoover Alt MD purported to be a family medicine clinic, offering general medical services, addiction treatment, and pain management treatment. Hoover Alt MD kept irregular business hours, often staying open past midnight.

6.     **ELIZABETH KORCZ** owned and operated a pharmacy within Hoover Alt MD (the "Korcz Dispensary").  The Korcz Dispensary did not accept insurance.

<h3 align="center">CONTROLLED SUBSTANCE STATUTES AND CONTROLLING REGULATIONS</h3>

7.     The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States.  With limited exceptions for medical professionals, the CSA made it unlawful for any

person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

8. Medical practitioners, such as physicians and nurse practitioners, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.03. Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number to each qualifying medical practitioner including physicians and nurse practitioners.

9. The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

10. A controlled substance assigned to schedule II meant that the drug had a high potential for abuse, was highly addictive, and that the drug had a currently accepted medical use in treatment in the United States or a currently accepted

medical use with severe restrictions. Abuse of a schedule II controlled substance could lead to severe psychological and/or physical dependence. Pursuant to the CSA and its implementing regulations:

a. Hydrocodone was classified as a schedule II controlled substance after October 2014, before which time it was classified as a schedule III controlled substance. It was an opioid pain medication.

b. Oxycodone was classified as a schedule II controlled substance. Oxycodone was sold generically and under a variety of brand names, including OxyContin®, Roxicodone®, Endocet®, and Percocet. Oxycodone, an opioid pain medication, is about fifty percent stronger than Morphine.

c. Hydrocodone and Oxycodone were among the schedule II opioid controlled substances that had the highest potential for abuse and associated risk of fatal overdose.

d. Amphetamines, including Vyvanse and Adderall (dextroamp-amphetamin), were classified as schedule II controlled substances. Amphetamines were used to treat attention deficit hyperactivity disorder or narcolepsy, as well as for weight loss.

11.     A controlled substance assigned to schedule III meant that the drug or other substance had a lower potential for abuse than schedule II drugs or other substances, the drug or other substance had a currently accepted medical use in the United States, and abuse of the drug or other substances may lead to moderate or low physical dependence or high psychological dependence. Pursuant to the CSA and its implementing regulations:

a. Suboxone was a schedule III partial opioid agonist/opioid antagonist combining buprenorphine and naloxone, used in opiate use disorder treatment to curb opioid dependence and to help treat withdrawal symptoms for opiate drugs.

12.     A controlled substance assigned to schedule IV meant that the drug or other substance had a lower potential for abuse than schedule III drugs or other substances, the drug or other substance had a currently accepted medical use in the United States, and abuse of the drug or other substances may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in the higher schedules. Pursuant to the CSA and its implementing regulations:

a. Alprazolam was classified as a schedule IV controlled substance. Alprazolam, sometimes prescribed under brand name Xanax, was a medication used to treat anxiety.

b. Clonazepam was classified as a schedule IV controlled substance. Clonazepam, sometimes prescribed under brand name Klonopin, was a medication used to treat anxiety and seizures.

c. Carisoprodol was classified as a schedule IV controlled substance. Carisoprodol, sometimes prescribed under brand name Soma, was a muscle relaxant.

13. A controlled substance assigned to schedule V meant that the drug or other substance had a low potential for abuse relative to schedule IV substances, the drug or substance had a currently accepted medical use in treatment in the United States, and abuse of the drug or other substance may lead to limited physical dependence or psychological dependence relative to schedule IV drugs or other substances. Pursuant to the CSA and its implementing regulations:

a. Promethazine with codeine was classified as a schedule V controlled substance. Promethazine with codeine, sometimes prescribed under

brand name Robitussin AC or Phenergan with codeine, was a medication used to treat coughs and upper respiratory symptoms.

14.    Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." It was well known that the combination of high-dose opioids and benzodiazepines (*e.g.*, alprazolam) in any dose had a significant impact upon the risk of patient intoxication and overdose. The risk of intoxication and overdose was increased when treatment included other central nervous system depressants, muscle relaxants (*e.g.*, carisoprodol), anticonvulsants, and short-acting opioid analgesics. For a treating physician to prescribe these combinations for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risk(s) to the patient's life.

15.    Chapter 21 of the Code of Federal Regulations, Section 1306.04, also directed that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as

the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

16.     Federal law prohibited physicians from pre-signing prescriptions, because "all prescriptions for controlled substances had to be "dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). "The refilling of a prescription for a controlled substance listed in Schedule II is prohibited." 21 C.F.R. § 1306.12(a); 21 U.S.C. § 829(a).

17.     The Alabama Board of Medical Examiners Administrative Code similarly prohibited physicians from pre-signing prescriptions: "It is improper, under any circumstances, for a physician to pre-sign blank prescription pads or forms and make them available to employees or support personnel."  Alabama Administrative Code, Chapter 540-X-4-.06(8).

18.     Urine drug screens were relied upon in the pain-management industry as a means of identifying a patient's non-compliance with the patient's treatment plan. Urine drug screens were used to identify abuse of illicit and controlled

substances not prescribed to a patient, and to identify a patient's failure to take drugs prescribed for the patient's treatment of pain.

19.     Alabama's prescription drug monitoring program ("PDMP") was a means of detecting a pain management patient's non-compliance with the patient's treatment plan.   A PDMP report contained prescription data for all controlled substances dispensed by pharmacies in the State of Alabama.   Pharmacies were required to report the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

20.     Under the Drug Addiction Treatment Act of 2000, physicians treating addiction to opioid narcotics could apply for and receive a "DATA waive" certification, which authorized the physician to conduct maintenance and detoxification treatment using specifically approved schedule III, IV, or V narcotic medications, including Suboxone.

## HEALTH CARE BENEFIT PROGRAMS

21.     The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were over the age of sixty-five and to qualifying persons with disabilities.

22.     Blue Cross Blue Shield of Alabama ("BCBS") was an entity that provided private health insurance to individuals.

23.     Medicare and BCBS were "health care benefit programs" as defined in Title 18, United States Code, Section 24(b).  Individuals who received benefits under Medicare or BCBS were typically referred to as "beneficiaries."

24.     Health care providers that provided medical services to beneficiaries were able to apply for and obtain "provider numbers" from the health care benefit programs.  A health care provider who was issued a provider number was able to file claims with the health care benefit programs to obtain reimbursement for medical services provided to beneficiaries.

25.     Payments under the health care benefit programs were often made directly to a provider of medical services, rather than to a beneficiary. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

26.     To obtain payment from health care benefit programs, the provider or the provider's designee was required to submit claims to the insurance carrier that included, among other things, the following information: (1) the provider's unique provider number; (2) the patient's name; (3) the patient's diagnosis prescribed by a standardized code; (4) a description of medical services rendered to the patient using standardized codes; (5) the date and location the medical services were provided; and (6) the amount claimed for the payment.

27.     Medicare and BCBS only paid for medical services that were medically necessary, actually performed, prescribed, and conducted by a properly licensed provider, and conducted and billed in compliance with the terms of the health care plan.

28.     The health care benefit programs relied on **ELIZABETH KORCZ** and **MATTHEW KORCZ** to submit true and accurate claims for services provided at Hoover Alt MD.

## OFFICE VISITS

29.     Medicare and BCBS relied upon standardized code sets to pay health care claims. One such set, the Current Procedural Terminology ("CPT"), consisted of five-digit codes that listed certain procedures and services performed or ordered

by health care providers. The procedures and services represented by CPT codes were health care benefits, items, and services within the meaning of Title 18, United States Code, Section 24(b).

30.     When claims were submitted to the health care benefit programs, health care providers or persons billing on their behalf were expected to identify the proper CPT code or other identifier that corresponded to the medical service provided, as well as any appropriate modifiers to designate personnel who performed the visit.

## COUNT ONE:
### Conspiracy to Unlawfully Distribute and Dispense Controlled Substances
### [21 U.S.C. §§ 846, 841(a)(1)]

The Grand Jury further charges:

31.     All previous paragraphs of this Indictment are incorporated here.

32.     From in or around June 1, 2015, through in or around May 31, 2018, the exact dates being unknown to the Grand Jury, in Jefferson County, within the Northern District of Alabama and elsewhere, Defendants

**ELIZABETH KORCZ,**
**MATTHEW KORCZ,**
**and**
**AUSTIN HASKEW**

knowingly and intentionally combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury, to violate Title 21,

United States Code, Section 841(a)(1), that is, to knowingly, intentionally, and unlawfully distribute and dispense, mixtures and substances containing a detectable amount of controlled substances, including schedule II-V controlled substances, not with a legitimate medical purpose and outside the scope of professional practice.

All in violation of Title 21, United States Code, Section 846.

## PURPOSE OF THE CONSPIRACY

33.     It was the purpose and object of the conspiracy for **ELIZABETH KORCZ, MATTHEW KORCZ, AUSTIN HASKEW,** and their co-conspirators to unlawfully enrich themselves by, among other things: (a) prescribing controlled substances without a legitimate medical purpose and outside the scope of professional practice; (b) filling those prescriptions at the Korcz Dispensary; and (c) using the proceeds from these activities for the personal benefit of **ELIZABETH KORCZ, MATTHEW KORCZ, AUSTIN HASKEW,** and their co-conspirators known and unknown to the Grand Jury.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which Defendants and their co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things,

agreeing among themselves and with others to operate Hoover Alt MD and the Korcz Dispensary in the following manner:

34.     Despite some aspects of legitimate medical practice at Hoover Alt MD, **ELIZABETH KORCZ, MATTHEW KORCZ, AUSTIN HASKEW,** and their co-conspirators primarily operated Hoover Alt MD as a pill mill, frequently providing dangerous, addictive, powerful opioid cocktails, for no legitimate medical purpose and outside the scope of professional practice.

35.     **ELIZABETH KORCZ** would occasionally see patients during office visits. More frequently, however, **ELIZABETH KORCZ** was absent from Hoover Alt MD. **ELIZABETH KORCZ** went weeks at a time without visiting Hoover Alt MD or seeing patients, but prescriptions continued to be issued. Often, Person 1 was the only employee at Hoover Alt MD during business hours.

36.     **ELIZABETH KORCZ,** with **MATTHEW KORCZ, AUSTIN HASKEW,** and others, distributed and dispensed controlled substances at Hoover Alt MD and from the Korcz Dispensary, including, but not limited to: hydrocodone, oxycodone, and amphetamines, all schedule II controlled substances; buprenorphine, a schedule III controlled substance; alprazolam, clonazepam, and carisoprodol, all schedule IV controlled substances; and promethazine with codeine, a schedule V controlled substance.

37.     **ELIZABETH KORCZ, MATTHEW KORCZ, AUSTIN HASKEW,** and their co-conspirators provided these drugs to cash-paying patients and to patients with health insurance.  As the owner and operator of both Hoover Alt MD and the Korcz Dispensary, **ELIZABETH KORCZ** received most of the proceeds.

38.     **ELIZABETH KORCZ** and **MATTHEW KORCZ** enlarged their profits by directing Person 1 or other unlicensed, unqualified, and generally unsupervised staff to perform medical tasks, such as opioid medication maintenance. **ELIZABETH KORCZ** and **MATTHEW KORCZ** often employed patients with substance-abuse conditions as employees at Hoover Alt MD.

39.     **ELIZABETH KORCZ**, aided and abetted by **MATTHEW KORCZ** and others, routinely provided Person 1 and others with pre-signed prescriptions to be used for distributing and dispensing controlled substances in **ELIZABETH KORCZ's** absence.

40.     **ELIZABETH KORCZ** directed **MATTHEW KORCZ, AUSTIN HASKEW**, Person 1, and others to distribute and dispense controlled substances to patients, via prescription and directly from the Korcz Dispensary, while **ELIZABETH KORCZ** was absent and without **ELIZABETH KORCZ** examining the patient or reviewing the patient's medical file.

41.     **ELIZABETH KORCZ** and **MATTHEW KORCZ** increased their profits by pressuring or requiring Hoover Alt MD patients to purchase many of their prescription drugs, including controlled substances, from the Korcz Dispensary for cash.

42.     **ELIZABETH KORCZ, AUSTIN HASKEW,** and their co-conspirators routinely ignored signs that Hoover Alt MD's patients were drug seeking, abusing the drugs prescribed, and were otherwise critically compromising their health and safety. Red flags routinely ignored included, but were not limited to:

a.  aberrant urine drug screens, including screens reflecting patients' illicit drug use, their use of controlled pharmaceutical drugs not prescribed by **ELIZABETH KORCZ**, and their abstention from pain-treatment drugs prescribed by **ELIZABETH KORCZ**;

b.  pleas and warnings from patients' families and friends about patients' drug abuse and deteriorating conditions;

c.  self-reporting by patients suggesting that their medication regimens were too strong (*e.g.*, car accidents), and self-reporting that patients had previously abused alcohol and drugs, including the narcotics they were prescribed by **ELIZABETH KORCZ**; and

d. communications from insurance companies warning of the dangers of prescribing specific drugs or combinations of drugs.

43.     **ELIZABETH KORCZ** sought to obstruct the investigation into her criminal conduct by instructing her co-conspirators to lie, including, but not limited to telling them to lie about: whether **ELIZABETH KORCZ** provided pre-signed prescriptions, whether dispensing from the Korcz Dispensary occurred in **ELIZABETH KORCZ's** absence, whether **ELIZABETH KORCZ** had examined a particular patient on the day he overdosed, and whether **ELIZABETH KORCZ** examined all new patients.

44.     **ELIZABETH KORCZ** and **MATTHEW KORCZ** paid their co-conspirators with proceeds from prescribing controlled substances without a legitimate medical purpose and outside the scope of professional practice, and from the money they made billing insurance companies for services that were not medically necessary, not provided, or both.  Ultimately, however, **ELIZABETH KORCZ** and **MATTHEW KORCZ** kept the vast majority of the proceeds.

All in violation of Title 21, United States Code, Sections 846 & 841(a)(1), and (b)(1)(C), (b)(1)(E), (b)(2) & (b)(3).

**COUNT TWO:**
**Maintaining a Drug-Involved Premises**
**[21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2]**

The Grand Jury further charges:

45.     All previous paragraphs of this Indictment are incorporated here.

46.     On or about June 1, 2015, through on or about September 1, 2017, the exact dates being unknown to the Grand Jury, operating in Jefferson County, within the Northern District of Alabama, Defendants,

**ELIZABETH KORCZ**
**and**
**MATTHEW KORCZ**,

aiding and abetting each other and aided and abetted by others, did knowingly, intentionally, and unlawfully use and maintain the following premises for the purpose of distributing schedule II-V controlled substances outside the usual course of professional practice and without a legitimate medical purpose:

**Hoover Alt MD, at**
**3421 S. Shades Crest Rd. Suite 111,**
**Hoover, AL 35226**

In violation of Title 21, United States Code, Section 856(a)(1) and Title 18, United States Code, Section 2.

**COUNTS THREE THROUGH SEVEN:**
**Unlawful Distribution of a Controlled Substance**
**[21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2]**

The Grand Jury further charges:

47.     All previous paragraphs of this Indictment are incorporated here.

48.     On or about the dates set forth below, in Jefferson County, within the Northern District of Alabama, Defendants listed in the table below aiding and

abetting each other and aided and abetted by others known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully distribute and dispense, and cause to be distributed and dispensed, outside the usual course of professional practice and not for a legitimate medical purpose, the following controlled substance or controlled substances.

49.    The allegations set forth in paragraphs 47 and 48 are incorporated here for each of the following counts:

| Count | Defendants | Date | Controlled Substance | Dosage Units | "Patient" |
|-------|-----------|------|---------------------|--------------|-----------|
| 3 | **ELIZABETH KORCZ, MATTHEW KORCZ,** and **AUSTIN HASKEW** | 7/29/2015 | Hydrocodone | 90 pills | J.S. |
| 4 | **ELIZABETH KORCZ** and **MATTHEW KORCZ** | 7/14/2017 | Oxycodone<br>Hydrocodone<br>Carisoprodol<br>Alprazolam<br>Promethazine-Codeine | 45 pills<br>180 pills<br>90 pills<br>120 pills<br>180 ml | C.M. |
| 5 | **ELIZABETH KORCZ** and **MATTHEW KORCZ** | 8/2/2017 | Carisoprodol<br>Alprazolam | 90 pills<br>45 pills | J.J. |
| 6 | **ELIZABETH KORCZ** and **MATTHEW KORCZ** | 8/4/2017 | Oxycodone<br>Hydrocodone<br>Alprazolam<br>Clonazepam | 90 pills<br>150 pills<br>60 pills<br>60 pills | P.J. |
| 7 | **ELIZABETH KORCZ** and **MATTHEW KORCZ** | 8/4/2017 | Oxycodone<br>Hydrocodone<br>Carisoprodol<br>Alprazolam | 90 pills<br>60 pills<br>90 pills<br>60 pills | A.L. |

In violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), (b)(2) & (b)(3) and Title 18, United States Code, Section 2.

### COUNT EIGHT:
### Conspiracy to Commit Healthcare Fraud
### [18 U.S.C. § 1349]

The Grand Jury further charges:

50.     All previous paragraphs of this Indictment are incorporated here.

51.     On or about June 1, 2015, through on or about May 31, 2018, the exact dates being unknown to the Grand Jury, in Jefferson County, within the Northern District of Alabama, Defendants,

### ELIZABETH KORCZ
### and
### MATTHEW KORCZ,

did knowingly and willfully combine, conspire, confederate and agree with each other and with other persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24 (b) namely, Medicare and BCBS, to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for medical services.

## PURPOSE OF THE CONSPIRACY

52.     It was the purpose and object of the conspiracy for the co-conspirators to unlawfully enrich themselves and others known and unknown to the grand jury by submitting and causing to be submitted false and fraudulent claims for medical services, including office visits, injections, and prescription drugs, that were not medically necessary, not properly provided, or both.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which Defendants and their co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things, agreeing among themselves and with others to operate Hoover Alt MD primarily in the following manner:

53.     **ELIZABETH KORCZ** and **MATTHEW KORCZ** were frequently absent from Hoover Alt MD.   Person 1, who had no medical licensure or qualification to perform medical care, was often the only employee present at Hoover Alt MD during business hours.

54.     **ELIZABETH KORCZ** and **MATTHEW KORCZ** routinely billed, and caused to be billed, healthcare programs for services as though **ELIZABETH KORCZ** had provided them, when the "services" were not provided at all, or were provided by Person 1 or another unqualified person.

55.     **ELIZABETH KORCZ**, **MATTHEW KORCZ**, and others routinely caused health care benefit programs to be billed for controlled substance prescriptions that were issued without a legitimate medical purpose and outside the scope of professional practice.

56.     In order to justify fraudulent insurance claims and deter detection, **ELIZABETH KORCZ** and **MATTHEW KORCZ** often directed Person 1 and others to falsify medical records.  At **ELIZABETH KORCZ** and **MATTHEW KORCZ's** direction, Person 1 and others routinely falsified patient vital signs, symptoms, diagnoses, and treatments.

57.     **ELIZABETH KORCZ** often falsified, and caused Person 1 and others to falsify, certification forms to be sent to healthcare programs, including BCBS.

## COUNTS NINE THROUGH FIFTEEN:
### Healthcare Fraud
### [18 U.S.C. §§ 1347 and 2]

The Grand Jury further charges:

58.     All previous paragraphs of this Indictment are incorporated here.

### THE SCHEME TO DEFRAUD

59.     Beginning on or about June 30, 2015, and continuing through on or about July 31, 2015, in Jefferson County, within the Northern District of Alabama, and elsewhere, defendants,

**ELIZABETH KORCZ**
**and**
**MATTHEW KORCZ,**

aiding and abetting each other and aided and abetted by others known and unknown

to the Grand Jury, in connection with the delivery of and payment for healthcare

benefits, items, and services, did knowingly and willfully execute and attempt to

execute, a scheme and artifice to defraud a healthcare benefit program affecting

commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare

and BCBS, and to obtain by means of materially false and fraudulent pretenses,

representations and promises, money and property owned by and under the custody

and control of Medicare and BCBS.

## MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

60.     The fraudulent scheme operated, in substance, as described in

paragraphs 53-57 of this Indictment, which are incorporated here.

## EXECUTION OF THE FRAUDULENT SCHEME

61.     On or about the date set forth below for each count, in Jefferson County,

within the Northern District of Alabama, and elsewhere, defendants **ELIZABETH**

**KORCZ** and **MATTHEW KORCZ**, aiding and abetting each other and aided and

abetted by others known and unknown to the Grand Jury, knowingly executed, and

attempted to execute, the scheme described above by knowingly and willfully

submitting, and causing to be submitted, to Medicare and BCBS, the following false

and fraudulent claims for payment for medical services not provided by

**ELIZABETH KORCZ**:

| Count | Approximate Date of "Service" | Beneficiary | Insurer | Approximate Amount Billed |
|-------|-------------------------------|-------------|---------|---------------------------|
| 9 | June 30, 2015 | C.C. | BCBS | $231.00 |
| 10 | June 30, 2015 | M.L. | Medicare | $115.00 |
| 11 | June 30, 2015 | G.H. | Medicare | $142.00 |
| 12 | July 8, 2015 | J.W. | Medicare | $115.00 |
| 13 | July 30, 2015 | C.C. | BCBS | $115.00 |
| 14 | July 31, 2015 | M.L. | Medicare | $115.00 |
| 15 | July 31, 2015 | G.H. | Medicare | $727.00 |

In violation of Title 18, United States Code, Sections 1347 and 2.

<u>**NOTICE OF CRIMINAL FORFEITURE**</u>
**[18 U.S.C. § 982(a)(7); 21 U.S.C. § 853(a)]**

62.    All previous paragraphs are incorporated here.

63.     Pursuant to Title 21, United States Code, Section 853(a), and Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to Defendants

**ELIZABETH KORCZ**
**MATTHEW KORCZ**
**and**
**AUSTIN HASKEW,**

that upon conviction of an offense in violation of Title 21, United States Code Sections 841, 846, or 856, or Title 18, United States Code, Sections 1347 or 1349, the following is subject to forfeiture:

a.     all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of the Title 21 violations alleged above;

b.     all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the Title 21 violations alleged above; and

c.     any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the Federal health care offenses alleged above.

This property includes but is not limited to

d.     $9,864.06 seized on August 25, 2017, from Cadence Bank Account number ******7300 held in the name of Alt MD PC DBA Hoover Alt MD PC; and

e.    $46,181.79 seized on August 25, 2017, from Renasant Bank Account number ******1011 held in the name of Alt MD PC DBA Hoover Alt MD PC.

## MONEY JUDGMENT

64.    Defendants are further notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

## SUBSTITUTE ASSETS

65.    Defendants are further notified that in the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of Defendants up to the total value of the property subject to forfeiture.

A TRUE BILL

*/s/ Electronic Signature*
_____
FOREPERSON OF THE GRAND JURY

JAY E. TOWN
United States Attorney

ROBERT ZINK
United States Department of Justice
Criminal Division, Fraud Section
Acting Chief

JOSEPH BEEMSTERBOER
United States Department of Justice
Criminal Division, Fraud Section
Deputy Chief, Health Care Fraud Unit

*/s/ Electronic Signature*
_____
DEVON HELFMEYER
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice

*/s/ Electronic Signature*
_____
MOHAMMAD KHATIB
Assistant United States Attorney